IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>      Respondent,<br><br>      v.<br><br>ERIC EMIL LEER,<br><br>      Appellant. | No. 86863-2-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

HAZELRIGG, A.C.J. — Eric Emil Leer was charged with two counts of vehicular homicide and two counts of vehicular assault, all alleged to have occurred while he was under the influence, after a wrong-way motor vehicle accident in January 2020. On appeal, he assigns error to the trial court's ruling to admit results from a 2022 retest of his blood sample which was obtained and first tested pursuant to a search warrant in 2020. Leer asserts that because the vial that contained his blood sample was past the "use by" date provided by the manufacturer by the time of the second test, those test results did not meet the requirements of the governing statute and administrative rules. We disagree and affirm.

FACTS

Eric Leer was driving a truck on January 4, 2020 and collided head on with another vehicle, resulting in the deaths of two occupants of the other vehicle and serious injuries to the other passengers. Mason County Sheriff's Deputy Chris

Mondry responded to the scene and observed in Leer several factors that he later testified were indicative of intoxication. Mondry obtained a warrant for a blood draw and took Leer to a local hospital for that purpose. Phlebotomist Adam Boing performed the blood draw in Mondry's presence; he and Mondry both later testified that the blood sample was captured in two grey topped vials.[1] Boing also explained that the vials contained a white powder consisting of sodium fluoride and potassium oxalate and were not expired at the time of the blood draw. Mondry agreed that the vials contained a white powder and were not expired at the time of the draw. After drawing the blood sample from Leer, Boing labeled the vials with Leer's personal information. This label was placed over the expiration date and lot number of the tube, completely obscuring that information.

On January 8, 2020, the State charged Leer with one count each of vehicular homicide and vehicular assault, both alleged to have occurred while Leer was under the influence of alcohol. Roughly two weeks later, the State filed an amended information that added an additional count each of vehicular homicide and vehicular assault, both with the same allegation as the original charges regarding driving while under the influence (DUI). The Washington State Patrol Crime Laboratory (WSP Crime Lab) tested Leer's blood to determine his blood alcohol concentration (BAC) in February 2020. Trial did not occur until the fall of

---

[1] Leer points out in briefing that "tubes" and "vials" are distinct, but that the terms are used interchangeably throughout the trial court record. The Washington State Patrol Crime Laboratory also appears to use the terms in a similar fashion as its website contains a searchable page for "Certificate of Compliance for Blood Vials," but the certificates themselves, prepared by the manufacturer, use the term "tube" to describe its product. *Compare* WSP BREATH TEST PROGRAM—BTP PUBLIC RECORDS INDEX, https://wsp.wa.gov/forensics/toxlabindex.php#bloodv (last visited Nov. 26, 2024), *with* BD CERTIFICATE OF COMPLIANCE, https://wsp.wa.gov/forensics/docs/toxicology/Cert_Comp_Blood_Vials/1040916_Vial_Cert.pdf, (last visited Nov. 26, 2024). Accordingly, this opinion uses the terms interchangeably as well.

2022.  At some point before trial, the forensic scientist who first tested Leer's blood in February 2020 left the lab and was no longer available to testify by the time of trial.[2]  The blood was retested by another forensic scientist in September 2022 after this court issued its opinion in *City of Seattle v. Wiggins*, 23 Wn. App. 2d 401, 515 P.3d 1029 (2022).[3]

Leer had previously moved to suppress the results of the blood test by challenging the basis for and execution of the warrant and, after *Wiggins*, he brought what was framed as a motion in limine seeking to exclude the results of the second test based on the State's purported inability to establish a proper foundation.[4]  He averred that because the vial was past the "use by" date provided by the manufacturer at the time of the 2022 test, the results were not adequate under the governing statute and administrative rules.[5]  On that basis, Leer sought to exclude the results of the 2022 test and prevent the State from making any mention of the 2020 test.  The State clarified that it did not intend to seek direct

---

[2] There is no indication in the record as to the nature of the original forensic scientist's unavailability or the State's efforts to secure their testimony at trial.  When asked about the issue at oral argument before this court, the prosecutor answered that this information was not in the record and that he did not have any knowledge about that issue outside the record.  Wash. Ct. of Appeals oral arg., *State v. Leer*, No. 86863-2-I (Oct. 29, 2024), at 13 min., 5 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024101190/?eventID=2024101190.

[3] The State did not attempt to admit the original test through the reviewer due to the holding in *Wiggins* that requires testimony from the forensic scientist who actually conducted the test in order to lay an adequate foundation for the admission of the results of that test without violating the right to confrontation.  23 Wn. App. 2d at 414.

[4] The State's position was that this was a motion to suppress under CrR 3.6.  While Leer did present written argument on this issue in a supplemental motion in limine, he also included it in his trial memo under the heading "Motion to Suppress Blood Results," but did not cite CrR 3.6 therein.  At argument on motions in limine, Leer's attorney characterized it as a motion to exclude based on "foundational issues."

[5] Because the expiration date was covered by a label at the time of the blood draw, the precise "use by" date is unknown.  However, the parties agreed that the typical use period established by the manufacturer is two years and that the vials in question here, if unexpired at the time of the original test in January 2020, would have expired by the time of the second test in late 2022.

admission of the original test from 2020, but the testifying forensic scientist would likely refer to it as part of the basis of her opinion that the 2022 test was "precise and accurate and specific and reliable." The trial court heard preliminary argument from both parties on the characterization of the issue. Leer then outlined the evidence he planned to offer in support of his position that the 2022 test was inadmissible based on foundation and the State's advised of its intent to have the forensic scientist who conducted the testing in 2022 testify in support of its position that the results from the second test met the legal standards for admission. The parties and the court eventually agreed to characterize the issue as one of foundation.

The State called Darlene Valencia, a forensic scientist from the WSP Crime Lab to lay the foundation for the admission of the 2022 blood test and she presented extensive testimony outside the presence of the jury for the purpose of resolving the potentially dispositive evidentiary matter. Leer's attorney conducted voir dire examination of Valencia three different times during the State's direct examination and averred that insufficient foundation had been laid to admit the 2022 test results. At the conclusion of Valencia's examination by the parties, the court heard additional argument and ultimately ruled that the second test was admissible. The jury found Leer guilty as charged and the court imposed a total period of confinement of 180 months, followed by 18 months of community custody.

Leer timely appealed.

ANALYSIS

I.      Admissibility under RCW 46.61.506 and Chapter 448-14 WAC

Leer's sole assignment of error goes to the trial court's ruling to admit the results of the 2022 retest of his blood sample that was collected in January 2020. The framing of his briefing suggests that he reads the relevant statute and code provisions as implicitly requiring compliance with manufacturers' statements on the utility of its vials for this particular purpose. Leer focuses specifically on the expiration date of the vials because the State generally relies on assertions from the manufacturer regarding the suitability of forensic blood draw vials for their intended purpose and use by the State to collect and store evidence for use in criminal proceedings. Thus, we begin with interpretation of RCW 46.61.506 and ch. 448-14 WAC, and in that process, consider our Supreme Court's recent analysis of sibling statutes and codes that govern breath analysis machines used in the prosecution of cases involving allegations of driving under the influence. *See State v. Keller*, 2 Wn.3d 887, 545 P.3d 790 (2024).

*Keller* was issued after Leer filed his amended opening brief, but before the State's response or Leer's reply were submitted. However, as it was not addressed in briefing, this court directed the parties to be prepared to discuss the case at oral argument, particularly the question of whether it has any bearing on Leer's appeal. In response to questioning by this panel, Leer distinguished *Keller* because it addressed the compliance of breath test machines with those specific rules and averred that it does not control outside of that particular context.[6] Leer

---

[6] Wash. Ct. of Appeals oral arg., *supra*, at 1 min., 2 sec.

further argued that *Keller* is distinguishable because the Supreme Court found the overall procedure in that case complied with the controlling law, even if the machines themselves did not, whereas here, the expiration of the vials was evidence of inadequate preservation which undermined the accuracy and precision of the resulting test such that the State could not meet its burden to establish the proper foundation required for admission.[7]

Leer also urged this court to consider, and adopt, the ruling of the Delaware Supreme Court in *Hunter v. State*, 55 A.3d 360 (2012).[8] The Delaware Supreme Court similarly considered whether it was "error for the trial judge to admit the results of [a BAC] test into evidence" because the foundational elements necessary to admit that scientific evidence were not met. *Id.* at 362. Specifically, the *Hunter* court relied on its own precedent and held that the "'admission of a test result that was not in compliance with the manufacturer's requirements jeopardized the fairness of [the] trial'" and the use of expired tubes "was in direct contravention of the manufacturers specification sheets." *Id.* at 366 (quoting *Clawson v. State*, 867 A.2d 187, 193 (2005)).

In response, the State averred *Keller* is controlling.[9] It emphasized that the framework for breath and blood evidence follows the same principles, requiring compliance with the code provisions as prerequisites for admissibility.[10] The State also urged this court to disregard *Hunter* because *Keller* is a Washington case which makes it clear that compliance with *the WAC* is the threshold for

---

[7] *Id.* at 3 min., 36 sec.
[8] *Id.* at 4 min., 46 sec.
[9] *Id.* at 9 min., 30 sec.
[10] *Id.* at 9 min., 40 sec.

admissibility.[11]  On that basis, the State contends this court should follow *Keller* and conclude that the passing of the manufacturer's recommended use by the time of the 2022 test went only to the weight of that evidence, but did not impact its admissibility.[12]  With this additional argument and authority in mind, we turn to Leer's core question on appeal and start with the plain language of the controlling statute and administrative rule.

A.      Statutory Interpretation

This court reviews matters of statutory interpretation de novo.  *State v. Murray*, 190 Wn.2d 727, 731, 416 P.3d 1225 (2018).  "The goal of statutory interpretation is to discern and implement the legislature's intent."  *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).  If that intent is clear from the plain language of the statute, then this court is required to effectuate that meaning and follow the intent of the legislature.  *State v. Granath*, 190 Wn.2d 548, 552, 415 P.3d 1179 (2018); *see also Dep't of Ecology v. Campbell & Gwinn, LLC,* 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).  We apply the same rules of statutory construction to administrative codes, "'particularly where . . . they are adopted pursuant to express legislative authority.'"  *Cannon v. Dep't of Licensing*, 147 Wn.2d 41, 56, 50 P.3d 627 (2002) (alteration in original) (internal quotation marks omitted) (quoting *City of Kent v. Beigh*, 145 Wn.2d 33, 45, 32 P.3d 258 (2001)).

In *Keller*, the district court had ruled that several breath test results were invalid and inadmissible because the machine performing the test was not in

---

[11] *Id.* at 18 min., 20 sec.
[12] *Id.* at 9 min., 31 sec.

compliance with methods approved by the state toxicologist and set out in the administrative code. 2 Wn.3d at 909. The district court had determined that the machine had to perform a rounding calculation at the time of the test in order to comply with the statute and code, but was not equipped to do so. *Id.* Our Supreme Court determined that the district court had not located that requirement in the controlling statute or codes, but "in certain other documents." *Id.* After considering the text of the controlling laws, our high court then concluded that our state does not impose such requirements and the district court had erred because it relied on something other than the plain language of the statute and code to reach that conclusion. *Id.* at 914-15.

Here, Leer would have this court read extrinsic documents, and not our statutes and codes, in order to determine the validity and admissibility of a blood test; specifically, statements from the manufacturer regarding the importance of the expiration dates of the tubes. RCW 46.61.506(3), the relevant statute in Leer's case, reads in part as follows:

> Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose. The state toxicologist is directed to approve satisfactory techniques or methods, to supervise the examination of individuals to ascertain their qualifications and competence to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the state toxicologist.

The state toxicologist promulgated code provisions under the authority of RCW 46.61.506(3); the relevant part of the rule at issue here provides the following requirements for the blood "[s]ample container and preservative":

(a) A chemically clean dry container consistent with the size of the sample with an inert leak-proof stopper will be used.

(b) Blood samples for alcohol analysis must be preserved with an anticoagulant and an enzyme poison sufficient in amount to prevent clotting and stabilize the alcohol concentration. Suitable preservatives and anticoagulants include the combination of sodium fluoride and potassium oxalate.

WAC 448-14-020(3).[13] While the state toxicologist relies on statements from manufacturers that the vials purchased by the State for forensic blood draws used in the prosecution of crimes contain the proper preservatives consistent with WAC 448-14-020(3)(b), nothing in these rules can be read as requiring compliance with *all* statements made by manufacturers regarding equipment used to collect and store blood evidence. If the legislature or the state toxicologist intended such a requirement, they certainly could have memorialized one, but neither has so acted. Thus, we follow the reasoning of our Supreme Court in *Keller* and hold that the requirements for establishing the proper foundation for the admission of blood evidence in a criminal conviction are confined to the plain language of the relevant statute and code.

---

[13] Throughout briefing and argument, Leer refers to a requirement for "[p]recision" and "accuracy," which can be traced to WAC 448-14-010(1). Leer's challenge on appeal does not rest solely on the WAC that contains these terms. That specific code provision relates to the procedural requirements for testing rather than the specifications of the vials themselves. WAC 448-14-010. The claim on appeal is more accurately understood through application of WAC 448-14-020 which relates to the sample container and preservative requirements. WAC 448-14-010 does implicate the vial, but only indirectly in that testing on an expired vial *may* be a procedure that lacks precision and accuracy, so the provisions can be read together in that way.

However, this phrase appears in the case law as shorthand to refer to the combined requirements of these two provisions and the code chapter as a whole. *See, e.g., State v. Schulze*, 116 Wn.2d 154, 167, 804 P.2d 566 (1991) ("The regulations approve the tests only if they meet strict standards for precision, accuracy, and specificity" as to WAC 448-14-010) *quoted in State v. Bosio* 107 Wn. App. 462, 467, 27 P.3d 636 (2001) (quote prefaces discussion of challenge couched in WAC 448-14-020).

B.    Admissibility

The crux of Leer's appeal is that the State did not meet its burden to make a prima facie showing as to the necessary foundation for admissibility because the expired vials were no longer in compliance with the statute that governs the testing of blood vials, RCW 46.61.506, and the code provisions that govern the approved methods for analyzing blood samples for alcohol, ch. 448-14 WAC.  In response, the State avers that it satisfied the requirement for a preliminary showing for purposes of admissibility and any challenges to the validity of the 2022 test results based on the expiration date of the vials go to the weight of the evidence, which were properly considered by the jury.

The standards for the collection, preservation, and storage of blood evidence intended for use in criminal prosecutions are carefully, and exclusively, set out RCW 46.61.506(3) and the WAC provisions addressed in section I.A., *supra*.  "These requirements ensure that the blood sample is properly preserved for testing." *Singh v. Dep't of Licensing*, 5 Wn. App. 2d 1, 8, 421 P.3d 504 (2018).  This court reviews the admission of a blood alcohol test for abuse of discretion. *State v. Brown*, 145 Wn. App. 62, 69, 184 P.3d 1284 (2008).  The defendant has the burden of showing an abuse of discretion. *Id.*  A trial court abuses its discretion when it admits a blood test without sufficient prima facie evidence. *Id.*

"Before blood alcohol test results can be admitted into evidence, the State must present prima facie proof that the test chemicals and the blood sample are free from any adulteration which could conceivably introduce error to the test results." *State v. Clark*, 62 Wn. App. 263, 270, 814 P.2d 222 (1991); *see also*

RCW 46.61.506(4)(a). The deferential standard through which the trial court considers the adequacy of the State's preliminary showing is set out by statute as follows:

> For purposes of this section, "prima facie evidence" is evidence of sufficient circumstances that would support a logical and reasonable inference of the facts sought to be proved. In assessing whether there is sufficient evidence of the foundational facts, the court or administrative tribunal is to assume the truth of the prosecution's or department's evidence and all reasonable inferences from it in a light most favorable to the prosecution or department.

RCW 46.16.506(4)(b). If this burden is satisfied, the blood alcohol evidence is admissible, but the accused person can still attack the results by introducing evidence "refuting the accuracy and reliability of the test reading." *State v. Straka*, 116 Wn.2d 859, 875, 810 P.2d 888 (1991); *see also* RCW 46.61.506(4)(c).

There are three stages where issues could arise that impact the admissibility of test results at trial: the initial blood draw, custody and storage of the blood sample, and the forensic testing itself. On appeal, Leer does not challenge the propriety of the blood draw. As explained herein, both Boing and Mondry testified regarding the initial draw pursuant to the search warrant. Their testimony established that the correct vials were used, they contained the proper chemicals for preservation, and were not expired at the time of the draw. Boing and Mondry also confirmed that there were no irregularities with the blood draw itself. Leer does not attack the chain of custody, the manner by which the vials were stored, or the process by which the 2022 blood test was conducted, which was explained in detail during Valencia's trial testimony.

Leer focuses solely on the expiration of the vials and avers this alone invalidates the results of the second test. The deferential standard for determining the threshold issue of admissibility of this evidence is crucial to assessing the propriety of the trial court's decision here. Leer alleges that because the vials "had expired, the State failed to prove proper preservation as required." In support of his position in the trial court, Leer supplemented his motion with materials filed in other cases, apparently drafted by the author of the amicus brief submitted in this case on behalf of the Washington Defender Association.[14] Leer did not, however, proffer his own expert to contest the testimony presented by the State. He filed a declaration of Elena Mack, the "WW Vice President of Quality Management, IDS—Specimen Management for the Life Sciences segment" of Becton Dickinson and Company (BD), manufacturer of BD "Vacutainer Tubes." However, the content of Mack's declaration makes clear that while it was prepared under penalty of perjury, it was offered "in lieu of live testimony from BD representative(s) in response to the [s]ubpoena" filed in an unrelated criminal matter in Spokane Municipal Court. Despite the fact that Leer offers no authority that would allow the judge to consider a declaration prepared under penalty of perjury for another cause in a different court,[15] the trial court appears to have considered it, along with the briefing and

---

[14] The State moved to strike a significant portion of the amicus brief submitted by the WDA, asserting that the argument presented exceeded the scope of Leer's appeal and that the brief referenced matters outside the record.

Because this panel is capable of disregarding argument and materials that exceed the scope of review of the case before us, the motion is denied. RAP 12.1; *see also Engstrom v. Goodman*, 166 Wn. App. 905, 909 n.2, 271 P.3d 905 (2012).

[15] At oral argument before this court, the panel raised the specter of prosecution for false swearing under RCW 9A.72.040 based on the filing of declarations prepared for other unrelated litigation, but those concerns do not appear to have been presented in the trial court. Wash. Ct. of Appeals oral arg., *supra*, at 21 min., 7 sec.

other miscellaneous documents from other criminal prosecutions that Leer filed under a cover sheet captioned "materials in consideration of court's preli[m]inary ruling on admission of blood test results." (Capitalization omitted.)

The State presented live testimony to counter the Mack declaration. Boing testified to his understanding that the expiration date provided by the manufacturer applies to the vacuum seal of the stoppers on the vials. To establish the State's foundational requirements under the statute and code provisions, Valencia testified that when she conducted the test in 2022, the blood was not coagulated, which suggested to her that the preservatives were functioning adequately. She further explained that she had expected that the concentration of alcohol would have decreased slightly if stored for a lengthy period of time, but would otherwise be unaffected. Valencia also described how she reached her opinions regarding the long-term use of tubes and the accuracy of testing from them. First, she referenced several toxicology journal articles. While these studies do not capture the exact factual scenario presented in this case, all three can be read as supporting a general proposition that the expiration of a vial has minimal impact on the BAC of the tested blood. The State is entitled to this inference under the plain language of RCW 46.61.506(4)(b) which directs that all reasonable inferences are to be considered "in a light most favorable to the prosecution." Second, Valencia described the training methods used at the WSP Crime Lab which involve retesting samples stored for "upwards of over five to ten years" and comparing the trainee results to those from the original tests. She reiterated her expectation that the second result would show a lower alcohol concentration, but the training practice

she described was strongly suggestive of the long-term use of these vials. This conclusion is another reasonable inference to which the State is expressly entitled. RCW 46.61.506(4)(b).

Division Two of this court recently considered this same issue on similar facts in its unpublished opinion, *Kanta v. Dep't of Licensing*.[16] Kanta challenged the admission of a blood alcohol test result on the basis that a test from an expired vial did not comply with the relevant WACs and, thus, could not be properly admitted. *Kanta,* slip op. at 5. This court rejected the assignment of error and noted that the "WAC does not require that the blood in the test tubes be tested prior to expiration of the tubes." *Id.* at 11. Additionally, the reviewing panel considered, but was not persuaded by, a declaration from the manufacturer of the vial regarding its efficacy past the provided expiration date. *Id.* at 3-4. The declaration was from Mack, on behalf of Beckton Dickinson and Company, again testifying about the BD Vacutainer Tubes.[17] *Id.* at 3-4. Although the court in *Kanta* did not reference *Keller*, it similarly rejected reliance on extrinsic documents in examining compliance and instead focused on the plain language of the WAC to determine admissibility, consistent with the holding of *Keller*. *Id*. at 5.

Taken together, the facts of Leer's case show that the State met its prima facie burden to establish that, for the purposes of admissibility, the vials were free

---

[16] No. 58434-4-II (Wash. Ct. App. Oct. 1, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2058434-4-II%20Unpublished%20Opinion.pdf.
Under GR 14.1(c), we may discuss unpublished opinions as necessary for a well-reasoned opinion. *Kanta* is included here solely to demonstrate well-reasoned consistency in deciding this issue.

[17] The portion of Mack's declaration that is quoted in *Kanta* is identical to her declaration, prepared for the Spokane Municipal Court case, that Leer filed in support of his own motion in the trial court. It is unclear if this is, in fact, the same declaration shared amongst DUI practitioners or if Mack prepared this declaration specifically for Kanta.

from corruption that could reasonably introduce error into the test results. Here, Valencia offered the trial court two separate bases for her opinion that the expiration of the vials, alone, was not an adulteration that would affect the results of the blood contained therein: the journal articles, and the consistent outcomes of the WSP Crime Lab's training practice of retesting old blood samples and comparing them to the original results. Although Leer engaged in extensive voir dire of Valencia to try and draw out testimony that the vials were no longer fit for use due to expiration, he did not challenge her qualifications to testify as an expert under ER 702.[18] Accordingly, the trial court had testimony from a qualified expert who opined that the results of the 2022 test were scientifically valid.

Given the deferential standard that applies, the trial court did not abuse its discretion when it admitted the results of the 2022 blood test.

II.     Preservation of Challenge under *Frye*

In briefing and at oral argument before this court,[19] Leer also averred that testing of vials past the manufacturer's expiration date is not a broadly accepted scientific procedure, rendering the admission of the evidence derived under those circumstances a violation of *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923) and its progeny. The State responded in briefing that this issue is not preserved because Leer failed to explicitly raise *Frye* before the trial court.

---

[18] "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ER 702.

[19] Wash. Ct. of Appeals oral arg., *supra*, at 7 min., 7 sec

The purpose of the *Frye* inquiry is not to decide the correctness of the scientific theory, but to determine if the theory is generally accepted in the relevant scientific community. *State v. Dunn*, 125 Wn. App. 582, 590, 105 P.3d 1022 (2005). For a *Frye* analysis to be taken up, it must be requested or, at a minimum, be apparent from the objections that *Frye* is being invoked. *State v. Wilbur-Bobb*, 134 Wn. App. 627, 632-34, 141 P.3d 665 (2006).

"The failure to make a timely objection to the admission of evidence precludes appellate review." *State v. O'Neill*, 91 Wn. App. 978, 993, 967 P.2d 985 (1998). We may decide to review an error that was not raised in the trial court if the appellant establishes that it is a manifest error that affects a constitutional right. RAP 2.5(a)(3). To meet the burden imposed by RAP 2.5(a)(3), the appellant must show that the error was manifest, in that they were actually prejudiced, and the error is truly of constitutional import. *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 309, 422 P.3d 458 (2018). However, "[f]ailure to lay an adequate foundation under *Frye* does not create a manifest constitutional error." *State v. Newbern*, 95 Wn. App. 277, 288, 975 P.2d 1041 (1999). If the party seeking review fails to present a *Frye* argument in the trial court, we do not need to consider it on appeal. *In re Det. of Taylor,* 132 Wn. App. 827, 836, 134 P.3d 254 (2006).

Leer did not formally seek a hearing, or object, under *Frye*. In fact, Leer's attorney only mentioned *Frye* once in his arguments before the trial judge in the following exchange:

> [Defense Counsel]: And I do, I understand the State's frustration, because they did everything right. He did everything right and COVID[20] hit and all these different things happened, right, but

---
[20] 2019 novel coronavirus infectious disease.

the data's not the same and the foundational requirements are that you can only use or confront the results that somebody performed if you can cross-examine them. That's it. That's the bottom line, and without that it doesn't meet the confrontation clause.

And then unfortunately, when they have to go back and retest, they're expired, which doesn't meet the manufacturer's recommendation. So—I mean, we can put a *Frye* test through this all day long, which we will go through with the individual. I say we be careful. And if the State—the State should be creative and figure out a way, but it shouldn't be with data that is not reasonably relied upon in the scientific community.

THE COURT: Unless I'm told otherwise. I mean, that's the foundation issue, right?

[Defense Counsel]: Yeah.

This exchange demonstrates Leer was clearly aware that *Frye* principles were implicated in his challenge to the admissibility of the results from the 2022 blood test, but rather than proceeding through well-established procedures for such a challenge, Leer instead conceded that he would explore the scientific acceptance of testing after the vials had expired through his cross-examination of Valencia. Further, in his briefing to the trial court and at argument on his motions, he expressly and repeatedly couched the acceptability of the practice as an issue of foundation, not one subject to an independent *Frye* hearing.

Leer did, however, submit a single document that contained references to *Frye*: an unsigned motion to suppress prepared by another attorney for use in defending against the prosecution of a misdemeanor DUI charge in Spokane Municipal Court. This motion rested on facts specific to that defendant and was filed along with a number of other documents that appear to have been originally authored or collected by that other attorney for use in that particular case. More critically, while perhaps providing helpful background information for the trial judge,

without more, filing documents from other cases is plainly insufficient to preserve a *Frye* challenge for purposes of appeal under controlling case law. *See Newbern*, 95 Wn. App. at 288; *Taylor,* 132 Wn. App. at 836. While Leer's trial counsel certainly could have argued from those materials in support of his position on this issue, rigorously applying the reasoning from the borrowed briefing to the facts of Leer's case, his failure to do so is fatal to this aspect of his challenge.

At oral argument before this court, in support of his position that the *Frye* challenge was preserved, Leer noted several places where his trial counsel had questioned Valencia with language couched in *Frye* principles.[21] For example:

> [Defense Counsel:] When testing blood, is it generally accepted in the scientific community that you're part of, and using the same methods and practices as you, other than I'm not talking about your lab at all. Do you know one scientist that would support your idea that it's okay, that it's accepted in the scientific community to use expired blood tubes, vials?
>
> [Valencia:] Yes.
>
> [Defense Counsel:] Who?
>
> [Valencia:] All of the analysts at the toxicology laboratory.
>
> [Defense Counsel:] Which one?
>
> [Valencia:] Do you want me to name one or . . . ?
>
> [Defense Counsel:] I want one scientist. You can name one friend. I don't care who it is, as long as they don't work in the toxicology lab.
>
> [Valencia:] I'm just very confused. Oh, just not in the toxicology lab?
>
> [Defense Counsel:] Yeah.
>
> [Valencia:] Okay. I don't—that is—I don't understand the question. I'm sorry, I don't understand. You want me to name another scientist who will—

---

[21] Wash. Ct. of Appeals oral arg., *supra* at 19 min., 57 sec.

[Defense Counsel:] I—you—are—is it generally accepted—we're going to break the—we're going to go backwards.

[Valencia:] Okay.

[Defense Counsel:] Is it generally accepted in the scientific community to use expired blood vials?

[Valencia:] I have not seen anything that states otherwise that it is—that there has been no literature that says specifically do not test on expired tubes. Does that make sense? And that would be other scientists. I mean, I have not seen any literature in regards to that. I have seen—I have seen literature in regards to testing expired tubes, but I have not seen anything where it stated that you cannot test expired tubes. I hope I'm understanding your question.

[Defense Counsel:] No, that . . . So, if the manufacturer's specifications is that they put an expiration date—and obviously you guys have heard all of this—

[Valencia:] Yes.

[Defense Counsel:] —and that's why you do these articles or whatnot. The manufacturer is indicating that the expiration applies to the entire tube. So, as a scientist, you're basing your belief that expired tubes are okay because of your experience, correct?

[Valencia:] In part, yes.

[Defense Counsel:] And these articles?

[Valencia:] Yes.

There is a very practical reason that the "failure to make a timely objection to the admission of evidence precludes appellate review." *O'Neill*, 91 Wn. App. at 993. That requirement exists because trial courts must be given the opportunity to attempt to correct the issue before we will decide whether they have erred. *See State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015) (explaining purpose of timely objection requirement is to give "the trial judge an opportunity to address

the issue before it becomes an error on appeal"); *State v. Gray*, 134 Wn. App. 547, 557, 138 P.3d 1123 (2006) ("To assign error to a ruling that admits evidence, a party must raise a timely objection on specific grounds.").  Given that Leer never explicitly asked for a hearing under *Frye*, only made one passing oral reference to *Frye* before the trial judge, and the portions of the filed motions, declaration, and correspondence that did invoke *Frye* were prepared by another attorney for a different case and, thus, lacked analysis specific to Leer's case, he has failed to preserve this challenge for review.

Affirmed.

WE CONCUR:

Díaz, J.